The next matter on our calendar is Scantibodies Laboratory vs. Church & Dwight Company. I will take appearances. Evan Mandel, Mandel Vendari, LLP, on behalf of Plaintiff Appellants, Scantibodies Laboratory. Good morning, Your Honor. Bart Williams from the Proskauer Rose Law Firm on behalf of the defendant, Church & Dwight. Thank you. We'll hear from Appellants. May it please the court, I have three brief points that I'd like to begin with. The first is that the threshold question in this case is whether the court should do what no other court has ever done and find that the parties here opted out of UCC 2-306's best efforts obligation without an express statement in the contract to that effect. The Supreme Court, this court, and the New York Court of Appeals have all held that contracts are interpreted as if applicable statutes and other laws that have been expressly incorporated into the contract text. As a result, the supply agreements must be read as if UCC 2-306 is part of the four corners of the supply agreements. The New York Court of Appeals, Anderson on the UCC, Williston on contracts, and courts all across the country all agree that an express statement is required in order to opt out of a background law. Church & Dwight cites only three cases in which courts found a UCC opt-out, Girard v. Amuli, Eastern Electric v. Seaberg, and Aventis Environmental v. Scott. In all three cases, the contract of issue contained an express provision that contradicted the UCC. If an express opt-out is required here, I think that ends almost the entirety of this case because even Church & Dwight does not argue that the supply agreements contain an express opt-out of the UCC. Second, the agreement that the parties actually reached in this case was identical to the UCC. The parties actually agreed that Church & Dwight would purchase pregnancy test kits exclusively from Scantabodies while the supply agreements were in effect, and that's obvious from the negotiation history. Church & Dwight demanded a meter release in its initial draft that gave it the right to purchase pregnancy test kits from third parties while the five-year agreements were in effect on 10 days' notice. Church & Dwight counter-proposed—excuse me, Scantabodies counter-proposed that Church & Dwight purchase 90% of its PTK requirements from Church & Dwight during the entirety of the contract's five-year term. Ultimately, the parties reached— Counsel, isn't it true that the new contract didn't involve CMD to order 90% of its requirements from Scantabodies? That provision was not in the new contract. That's 100% correct. Scantabodies' response to the initial draft was that Church & Dwight be required to purchase 90% of its requirements from Scantabodies for the entirety of the five-year contract. After that, the parties reached an agreement, a compromise on the issue, and that compromise involves radically changing the meter release provision. Instead of it permitting Church & Dwight to purchase from third parties on 10 days' notice, it required Church & Dwight to give Scantabodies an opportunity to match the lower-priced supplier, and if Scantabodies couldn't match the lower-priced supplier, then Church & Dwight had to terminate the contract on 12 months' notice. In other words, Church & Dwight could switch to the lower-priced provider, but only after a 12-month notice period during which Church & Dwight had to purchase exclusively from Scantabodies. The 90% provision, just in terms of numbers, the parties expected 30 million PTKs to be sold per year. So the 90% provision would have guaranteed Scantabodies purchases of approximately 135 million test kits. That's 90% of Church & Dwight's requirements over a five-year period. The term that the parties actually agreed upon required Church & Dwight to purchase from Scantabodies for only a year, so it was only a guarantee of 30 million test kits. So the compromise that the parties actually worked out was far more in Church & Dwight's favor than it was in Scantabodies' favor. And one of the things the district court cited to interpreting the agreement is the parole evidence, and particularly Scantabodies' participation in the RFP without the meet-or-release provision. Why is that evidence not so strong that no reasonable juror could find the parties agreed otherwise? Well, I think the case law is quite clear, particularly the A.M. Knitwear case, also Anderson on the UCC, Wilson on contracts, and the other cases that we cited. If you're going to opt out of the UCC, the opt-out has got to be within the four corners of the agreement, and I think that's the threshold question. So I don't think the parole evidence could ever be sufficient enough. But I also think the district court erred in its determination with respect to that RFP evidence. What happened with the RFP was that we agreed to reduce our prices in exchange for a longer meet-or-release clause. And we said in the actual bid that the meet-or-release was our security with the business. That's an exact quote. And Church and Dwight understood perfectly what we were talking about, and that's on two pages in the record. That's on pages A693 and A613. So it's clear that by offering to extend our meet-or-release from 12 months to 24 months, we believe that the meet-or-release provision was what offered us the guarantee in the business, and it was, in effect, a 12-month guarantee. And Church and Dwight's internal communications where they say, we understand that they want a longer meet-or-release, and that's a page, I believe, A613, they confirmed that they also understood that the meet-or-release was our security with the product. The other, I mean, I think the most telling piece of significant evidence, of extrinsic evidence, about which there is no dispute is that when it came time to negotiate the second of the two supply agreements, which was the digital supply agreement, our bid stated, quote, SLI will be guaranteed all digital manufacturing for C&D for five years, same as current analog agreement. And Church and Dwight accepted the bid. That's record A2280. Church and Dwight, in this brief, is very, very careful not to dispute, A, the fact that that was our bid, or B, the fact that they accepted that bid. So the undisputed facts in this case show that our bid was specifically defined as being guaranteed all digital manufacturing. So I think the extrinsic evidence strongly favors scantibodies in this case. The other piece of extrinsic evidence that's critical is the course of performance. The undisputed facts are that Church and Dwight purchased pregnancy test kits exclusively from scantibodies during the entirety of the supply agreements. That's roughly a four-year period. That's from 2009 until the end of 2013. It's slightly over a four-year period. Under UCC Section 2-2082, courts are required to adopt any reasonable interpretation of a contract that's consistent with the course of dealing. So if the court were to look at supply agreements and conclude that there were two reasonable interpretations of them, the court under UCC 2-208 would find that these contracts were, in fact, exclusive. Counsel, your time has expired. You have reserved three minutes for rebuttal. We'll hear from the appellee. Thank you, Your Honor. SLI is asking the court to imply obligations that the parties did not write into their agreements. There is no language in the agreements that states or even suggests that these are requirements contracts or that Church and Dwight was obligated to purchase its test kits exclusively from SLI. SLI tries to rewrite the agreements based on certain provisions that they say make sense only if the agreements are requirements contracts. But the provisions they cite are inconsistent with an arrangement where SLI had an exclusive agreement with Church and Dwight or an agreement to provide any particular percentage of C&D's needs. Excuse me, but why would Church and Dwight need the meet or release clause if it was a non-exclusive option contract? The meet or release clause, Your Honor, Section 4.4, provides that if C&D can purchase a product at a price that is lower than the total delivered cost that was offered by SLI, Church and Dwight may, and the language is permissive, Church and Dwight may notify SLI that it has received a lower bid from someone else. That would seem to mean that in the absence of that contingency, it may not. What it means, Your Honor, is that the choice is Church and Dwight's as to whether or not it is going to notify SLI that it has a lower bid from someone else. That is step one of the process under Section 4.4. If Church and Dwight chooses to notify SLI, then and only then does SLI have the opportunity to try to match a lower price. But the other way to look at that may is that Church and Dwight may find that there's a lower price available from somebody who is either not responsible or does not maintain quality. But it doesn't have to give notice of the availability of a lower price. It may or may not do that, but if it does, and SLI doesn't match that price, then it says that Church and Dwight may purchase the product from such other supplier, which would seem to mean that in the absence of that contingency, it could not do so. Your Honor, that assumes, that reads out of the agreement, the notion that Church and Dwight will from time to time place orders, which is Section 5 of the agreement, the quantity requirements. As the Court previously noted, the previous contract that was binding between the parties had a provision that required that Church and Dwight purchase 90 percent of its PTK kits from SLI. During the negotiation for these contracts, that was removed, and Church and Dwight made clear that it was not going to enter into any sort of an agreement that had any sort of a requirement. And so that left the parties with a quantity requirement in Section 5 that simply says that Church and Dwight will from time to time place orders, and that SLI will provide quantities that are ordered from time to time by Church and Dwight. Under your interpretation of this contract, could Church and Dwight have moved 95 percent of its orders to another supplier without going through the meet or release provision, and then required Scantabodies to produce a much smaller amount of kits at the same price? Under the provisions of the contract, Your Honor, Church and Dwight could have selected to purchase from others, and in fact did over the course of the contract, earlier in the contract, did purchase from time to time from others. Church and Dwight did not have to make any purchases from SLI under the language of the contract. C&D had another agreement, excuse me, under the provision that allows Church and Dwight to terminate the agreements under Section 4.4 under meet or release. That provision means that if Church and Dwight chooses to notify SLI that it has another price from some other supplier that is lower, then SLI can try to meet that price. In other words, this provision recognized the very strong leverage that Church and Dwight had here. Church and Dwight owned all of the intellectual property here. Church and Dwight was the party that was simply asking for a manufacturer to make some of its products, and Church and Dwight had made clear that it was not going to have any sort of an agreement that required any particular percentage, much less all of its requirements. Therefore, the meet or release here is similar to the sort of language that existed in the BRC rubber case, which we cite in our brief. Well, if I may, what do you make of the alternate supplier provision, which is 5.4, which said that if SLI couldn't supply Church and Dwight for more than 30 days, then Church and Dwight may purchase from other suppliers. That sounds like otherwise it may not. The alternate supplier provision, Your Honor, is actually section 6.4, and it says that if SLI is unable to supply Church and Dwight for a period of more than 30 days, Church and Dwight may purchase from another party or manufacturer for its own benefit. As the trial court explained, that provision protects C&D in the event that SLI is unable to fill an order that C&D has already made. It does protect C&D because it enables it to purchase from other suppliers until such time as SLI can resume supplying. But it sounds like as soon as SLI can resume supplying, Church and Dwight can no longer use other suppliers. What am I missing? Under 6.1.1, C&D has to provide SLI with a production plan, and that production plan, Your Honor, has a one-month firm offer for each month. That's a provision that relieves C&D from a purchase order, 6.4, the alternate supplier section. That relieves C&D from a purchase order when SLI is unable to satisfy that order, and the very notion that that would make this provision superfluous doesn't make sense. The alternate supplier provision exists in order for C&D to exercise a choice as to whether or not it's going to purchase from SLI or not. That provision, 6.4, relieves C&D from a purchase order when SLI is unable to satisfy that order, and that makes perfect sense. Otherwise, under the agreement, once an order is placed, Church and Dwight would have no recourse. It would not be able to go to another supplier. But all of this is a different question from whether or not there is an obligation on Church and Dwight's part to place orders with SLI in the first place. All of the evidence leading up to the signing of these agreements suggests that that was asked for by SLI but was not accepted by Church and Dwight. And it's in that respect that the document that counsel referred to in his argument, page A2280 of the record, in that respect, counsel is just simply wrong about that. This is not a case where Church and Dwight agreed to a bid that was set by SLI. In fact, those documents, if the court examines A2280, that is a document that was a request. It was aspirational on the part of SLI. But none of the provisions, if the court looks at page 2280, ever make their way into the contract. Indeed, the contract has different provisions. So this document that counsel raised for the first time, by the way, on appeal and never put before the district court, does not represent a bid that was submitted by SLI and then accepted by Church and Dwight. That simply is not the case. The fact is, Your Honor, that there are provisions in this contract that would make no sense if this, in fact, were a requirements contract. We'd like to point the court to section 4.5 of the contract, for example. Section 4.5 is a section that talks about new items, and it permits SLI to add items to the contract that it desires to manufacture or sell. That provision would make no sense at all if it were the case that this were a requirements contract, because it would mean that all SLI has to do in order to essentially invade any aspect of Church and Dwight's business would be to simply say we'd like to add baking soda, which is a big product of Church and Dwight, or we'd like to add Trojan condoms, which is another big product sold by Church and Dwight. That provision, 4.5, would make no sense if Church and Dwight were required to purchase all of its products from SLI. Similarly, section 6.1.3 of the contract, which says that if Church and Dwight deviates by more than 10% from its earlier production plan, SLI does not have to fulfill Church and Dwight's order for that month, that provision would make no sense if this were a requirements contract, because by its very nature, it states that if there's more than a 10% deviation from the production plan that is sent a couple of months earlier, SLI does not have to fill that order. Simply put. Your time has expired. Let me turn to Appellant, who retained three minutes before we brought up. Thank you, Your Honor. There are four different provisions in the contract that have no meaning whatsoever. If it's not a requirements contract. The meter release provision, the repricing provision, which is section 4.2.3, the alternative supplier provision, and the termination provision. Let me just start with a discussion of the repricing provision. The repricing provision permits Scantabodies to reprice the goods if and only if Church and Dwight moves 20% of the volume of the goods to another supplier pursuant to the meter release. So our right to reprice is limited to whether the transfer of the volume is via the meter release or via some other imaginary means that only Church and Dwight thinks exists. So under Church and Dwight's reading of the contract, I don't think they really answered this question from Judge Sanis. If they can move volume outside of the meter release, they can move 95% of the volume, and we would have to continue to sell them goods at the exact same price. No one would ever enter into that agreement, and we certainly didn't enter into that agreement here. Similarly, the language in the alternate supplier agreement, it states that they can buy from a third party, quote, until such time as SLI can resume supplying Church and Dwight in a timely manner, close quote. If it's not a requirements contract and they're free to buy from third parties whenever they want, that phrase has absolutely no meaning whatsoever in the contract. The phrase that you just quoted uses the word products with a capital P, and as your adversary has pointed out, section 4.5, referring to new items, is talking about adding new products. So it looks like this is sort of an accordion agreement that you can add new things into it. And if that is so, it's difficult – it makes it harder to see it as a requirements contract. I'm glad you asked about 4.5, Your Honor. 4.5 does not give us the unilateral right to add products to the contract. That is not what it says at all. I'd urge the court to look at the exact text of that provision. So there's going to be negotiation on price. Yes, of course. Once the price is agreed upon, then it'll be a product with a capital P, which according to you means that Church and Dwight has to purchase all of it from you. Well, but the party – even under that reading of the contract, both parties still have complete and absolute freedom. They can – Church and Dwight can refuse to agree to a new price and say, look, with this new product, we're not going to do it under the existing agreement. We're happy to do it under a new agreement, and that's in fact what happened with the second supply agreement, the digital PTKs. They did not just add a product to this agreement. They decided to enter into a totally new separate agreement. So Church and Dwight wanted to buy half of some new product from us. There's nothing about 4.5 that prevented the parties from entering into an agreement to that effect. The reality is huge swaths of this contract would have absolutely no meaning if it's not a requirements contract. The only other thing I'd really like to mention is the scrapping cost claim because the scrapping cost claim is totally separate from the lost profits claim. And whether it's a requirements contract or not, the contract unambiguously requires Church and Dwight to pay Scantabody's scrapping cost, which is approximately a $1.9 million claim. In its motion papers below for summary judgment, it did not – Church and Dwight did not provide any basis whatsoever for it to receive summary judgment on this claim. I know that it's styled its motion papers as a motion for summary judgment on everything. When you read the actual text of their argument, they had no argument whatsoever as to why they should receive summary judgment on this claim. Our opposition briefs addressed that claim precisely, explained why it's a successful claim, why they hadn't made any showing of summary judgment whatsoever. And however the requirements contract issue comes out, our scrapping cost claim should be restored. Thank you. Thank you both. I will reserve decision.